Board of Commissioners, et al., Defendant Jennifer L. Smiley, Defendant Appellant. Oral argument not to exceed 15 minutes per side, Mr. French for the Defendant Appellant. Good morning, your honors, may it please the court, I'm attorney Andrew French, I'm here on behalf of Defendant Appellant Deputy Jennifer Smiley, and I'll be reserving five minutes for rebuttal. We are here for a de novo review of the district court's denial of Deputy Smiley's motion for summary judgment that arose from Plaintiff Cory Driscoll's 1983 action for claim of excessive use of force. This is a de novo review because the only issues that remain are matters of law. The material facts in this case are not in dispute. Deputy Smiley shot Cory Driscoll because she reasonably believed that Driscoll had gasoline, had doused himself with the gasoline, potentially had a lighter, and as he proceeded in an aggressive manner towards her, she was genuinely, reasonably, and objectively concerned. Can I stop you and ask if you would agree with this point? So I think I agree with you that the district court may have confused some legal questions for fact questions by suggesting that the ultimate kind of issue of reasonableness is for the jury, whereas the Supreme Court has said it's for the courts to decide. But doesn't that point go both ways? By which I mean, suppose we disagree with you on the law. There's really nothing here for a jury to do other than assess damages. So if we think that the law was clearly established, so the video's undisputed, we think that the video, the facts of the video, do not show probable cause of a serious threat of harm, which is the Garner Standard, and we think it's clearly established. Is there any factual matter that could make a difference in this conclusion? Isn't it just all a question of law? Yes, I would agree if we get past this stage and it were to go to a jury, yes. I assumed that that was the logical conclusion from kind of your analysis of what is for the jury and what is for the judge. So it seems to me that almost this is a question for us, the facts are undisputed, and then if we disagree with you, it's essentially a damages trial. Essentially yes. Now, I suppose if we were to get past the reasonableness standard under the Fourth Amendment, you're correct, the question would be damages, and the jury could, I suppose, assess to some extent reasonableness in a general sense in determining damages as far as who's more at fault or assessing percentages of damages, but yes, I would agree. If we get past this stage, it's a question of damages. So getting to that point, why isn't, so it seems to me that perhaps the best case for your friends on the other side is Palma. Why doesn't Palma clearly establish the notion that her belief that Mr. Driscoll was a serious threat was unreasonable? I believe the difference between Palma is in Palma there was no logical, no reasonable basis for the officers to believe that Palma was armed or, if armed, that he posed a threat of serious physical harm. Also in Palma, the officers were aware of Palma's mental health issues, which factored into perhaps assessing the reasonableness of their actions. That is a far cry from what we have here. When Deputy Smiley first encountered Driscoll, she was completely unaware of what, if any, mental health issues he may or may not have had. It's also interesting to note that while Driscoll spends a great deal of time in some of his evidence outlining the extent of his mental health issues, even he states that when he first encountered the deputy and he was making these constant chanting, indiscernible sounds, I don't believe he was claiming that he was suffering from a mental illness or that this was subject to a mental disorder. His claim is he was just praying, and that's the way he prays. He prays in tongues. Even Driscoll seems to acknowledge that initially he was not suffering under the influence of any mental health issues. Help me understand that on this record. It appears to me on this record that what he says is that her statements to him exacerbated where he was mentally and threw him into a manic phase. But I don't think there's ever, please point me to it if I'm misunderstanding. I don't think there's anything in the record that indicates that he was not already in the throes of a mental crisis by the time Officer Smiley came. I'm struggling with how she would not have recognized his open-handedness, his rather incoherent statements to her, his, well, shoot me. All of those things follow the report of people who were out at the park who were worried about him. It was a wellness check. So I don't understand the basis for your argument. Well, you have to understand that we're limited to what did Deputy Smiley know. Deputy Smiley, according to the dispatch, this was a suspicious person making loud, indiscernible noises and one of the caller-ins reported he might be on something. So when she encountered... Nobody said, nobody told her anything about gasoline, right? From the dispatch? From the dispatch, yes. Or about a lighter from the dispatch, right? No. From the dispatch, one of the dispatch notes was that the caller-in had reported possibly seeing a lighter in the car but was not 100% sure. So there was at least a suggestion that he might have a lighter, which again factored into her decisions. Make sure that I'm... Correct me if I'm wrong, was that lighter mentioned to Deputy Smiley by the person who contacted her, by the dispatch team? It was in the written dispatch. No, was it... She got the dispatch verbally. Was there anything in the dispatch that told her about the lighter? My understanding of the record is there was not. No, not the oral dispatch. She did also receive, through her on-board computer, the written dispatch comments. The comments mentioned the lighter, but you are correct that the spoken words from the dispatch did not mention a lighter, you are correct. But the dispatch communications, the written dispatch notes that she saw on her on-board computer mentioned the lighter, and that factored significantly into her decision making. But, I don't know, it seems like the gasoline came from nowhere. This notion that there's gas there, I mean, he was drinking the substance, right? Yes, he drank the substance several times, three or four times, yes. I've never consumed gasoline, I don't know anybody, I've never witnessed anybody drinking gasoline, and the record doesn't definitively answer the question of what effects would drinking gasoline have on a person, particularly given the comment that this person may be on something. If somebody is under the influence of drugs, some sort of substance, I don't know, nor does the record indicate, and certainly Deputy Smiley didn't know, what effect that would have. If somebody is under the influence of some sort of substance and he's drinking gasoline, what sort of physical, you know, would he gag, would he choke, we certainly don't know that. If you watch the video, the video, a reasonable person watching that video could conclude that what is in that jug was gasoline. It looks like gasoline. And I would note, there were five bystanders, if you will, the group that were there, all five of them gave written statements immediately after this incident, and in three of those written statements, the bystanders mentioned gasoline. So it was not just Deputy Smiley who perceived this as possibly gasoline. Did their testimony relate to things that Smiley had said, as opposed to what they knew about the jug prior to what Deputy Smiley did? To answer your question, no. They did not specify it's anything that they heard Deputy Smiley say. If you listen to the video, the mention by Deputy Smiley of gasoline was on a radio communications. You cannot hear those portions of the communications on the recording. So just from the video, we don't know what these five heard Deputy Smiley say about gasoline. All we know is one of them stated that Driscoll said, pouring gasoline on him, this is the blood of Christ, or this is the blood of Jesus. The other wrote that Driscoll says then this is gasoline, then pours it on him. The other said Driscoll then yelled gasoline and proceeded to sling around his jug. So those are the three comments mentioned in the written statements about gasoline, directed specifically at things that they heard Driscoll say.  Thank you. If there are no further questions, you'll have your rebuttal. Thank you. Good morning. May it please the Court. My name is Rob Linneman. I'm joined at Council table by my partner, Lou Serkin. We represent Corey Driscoll. We will ask this Court today to affirm the District Court's order denying qualified immunity and statutory immunity to the defendant and the appellant here, Jennifer Smiley. This Court will spend this 30 minutes focused on a lot of the details, being very, very much in the granularity of objective reasonableness. But it's important to look at the big picture here. Corey Driscoll took a walk in the park, and he was shot by a police officer for carrying a bottle of water. The questions that have been asked so far speak straight to the points that I wanted to address. The first . . . Can I stop you just with the same question that I asked your friend on the other side? I do think that the District Court suggested conflated jury questions for judge questions because the District Court suggested that the ultimate dangerousness question, whether there was probable cause of a serious threat of physical harm, was for the jury. And I think under the Supreme Court's precedent, the Court should have made that determination rather than say there's a fact dispute to send it to the jury. And I'm curious of whether you agree with that assessment or disagree. I agree with the Court's statement of the law that this is a question of law, not a question of fact. However, always on qualified immunity cases, on summary judgment, there is the interrelationship of Rule 56. I agree. So if there's any historical fact, say there was a dispute of fact like in Palma about whether the person was walking aggressively towards the police or whether the person was going at a glacier's pace, that question would be for the jury. And then the resolution of that question, yes or no, could maybe have made it reasonable or unreasonable. The problem I'm having here is it seems like there's no historical questions like that at issue and that this should really just be for the Court and either there should be a grant of qualified immunity or there should be a damages trial. And I'm not certain I see any kind of room for a factual dispute that could make a difference. I'll address that in a couple of ways. First, with respect to the language that the district court used here, I agree. I'm aware of the language that you're referring to where the trial court essentially said or the district court essentially said there is evidence from which a reasonable juror could make a particular finding. I think at the end of that section, and this opinion, of course, deals with several other claims, so there's only a small section. But at the end of that section, I believe that the district court clarifies that the correct legal standard is applied. The language is he eschews the language of reasonable juror in the final conclusion. But as to the distinction you're making here between what's left at trial, I think it is accurate to point out that the reasonable inferences, the plaintiff would not be entitled to all reasonable inferences, for example, at the trial. So I think there's still plenty of room for that. For historical facts, correct. So if there is a setting aside the law, what actually happened for any historical facts, the plaintiff wouldn't be entitled to any reasonable inference in the plaintiff's favor. But I mean, we have a video. I don't know what is in dispute here other than the legal question. There is not much that's in dispute. I think in that sense the trial court got it exactly right. The trial court said that really the reasonableness question comes down to whether it was reasonable in the first place to believe that that was gasoline in the jug, right? And the trial court went on to say that even if it is gasoline, without a lighter, and if the subject, if the suspect doesn't have a means to ignite it, then that puts assuming that it's gas, then the level of threat is much lower. It is no longer reasonable. Why is that? So, I mean, I've watched the video plenty of times, and so it's not at all clear to me what she should have done in the final three seconds. So he's dropped the jug, his arms are out to his side, and he's walking. He's seemingly walking right at her, pretty aggressively. I wouldn't say he's running, but he's moving, walking fast. I guess is the way I'd describe it. And at that moment, I mean, what rule would you say is appropriate for a police officer, knowing everything that we know? He's acting erratically. He said, shoot me. He said, come on, in kind of an aggressive manner. Do you think that we should adopt a Fourth Amendment rule that at that point the officer has to run away? Because it seems to me pretty likely that a reasonable officer could think, this guy is coming at me to punch me, attack me, grab my gun, and I just don't know what the officer is supposed to do in response to that threat. Well, at that point, a couple of things. First, I would say the officer had an option which had been used successfully to that point. Each time, until she began cursing at him, until she began saying, I'm going to shoot you. If you take one more move, I'm going to shoot you. Until that time, she successfully retreated, moved forward, retreated, moved forward, and it never escalated. So that is the first technique that was available to her, which had proven itself successful to that point. But what rule of ours says an officer has a duty to retreat? I think that's the point you're making is maybe run away is just pejorative, and what you're kind of saying is just backing up a little bit, giving him space. Yes, exactly. At this point, this court has on numerous occasions held that the training that an officer has is relevant to determining the reasonableness. In fact, similarly, this court has held that where an officer violates policies or procedures that are in place, that is relevant to reasonableness, too. And in this case, we have both of that. We have a use of force policy, which the plaintiff has submitted expert testimony on, which submits that this officer had other lesser force alternatives. We also have violation of an obvious policy in dealing with persons suffering from mental health issues. And at this point, the focus on the final seconds is, of course, relevant, but it's not the whole inquiry. It's the totality of the circumstances. And this court has on other occasions held that simply pulling a gun for an officer to point a firearm at an unarmed, non-dangerous subject is itself a fourth violation of excessive force. So when we consider the totality of the circumstances. And I would ask you about the new governing law, the new Supreme Court case. I know there's been much of our precedent has discussed isolating each factor, looking at only the concerns that immediately preceded, not seeing, always limiting those. And we're pretty express on that from Deluzio on out. But the Supreme Court has recently explained that that's not the case, right? Isn't the most recent Supreme Court decision one that emphasizes you have to look at all of the circumstances, that this segmented approach does not bar you from considering all of the context of the use of force? I read Barnes v. Felix similar to the way the court has articulated it. In fact, what the petitioner in Barnes v. Felix wanted to, the rule that was posited, they framed it as the moment of the threat rule, which the Supreme Court rejected, in favor of a test that considers all of the circumstances. So with that in mind, that's precisely the point where I was trying to get to, was that while in that last moment, that has been the primary focus that the officer has raised in all this time. But it strikes me that this court is really looking at how the officer handled the interaction from the beginning. How does that cut? Because it cuts both ways in some respects. I think I agree with the district court that the officer was more of the aggressor up front, and maybe it was a bad strategic call to pull out a gun rather than a taser or pepper spray. But the full context does hurt your client's position because it does confirm that he was acting erratic, shouting, shoot me, shouting, come on, in an aggressive kind of way that usually conveys I want to fight type of thing. So it's not obvious to me that the full totality, I mean it helps both parties and hurts both parties in some respects. Well, when we combine that with this court's holding, and where I go with that is ultimately, whatever one thinks about, and admittedly, Mr. Driscoll was experiencing a mental health incident of some sort. It's difficult to describe exactly. But the amount of force is what's at issue here. I think, and the trial court observed this, that there is some amount of force that had Deputy Smiley use a different amount of force that would have been held constitutional. But the issue in this case is that she went straight to lethal force, leaving no other option. Do you think it would have been a different case if, assume the facts, where she just waited a few more seconds, and he had actually kind of put his hands on her. Do you think she would have been able to use lethal force at that point? That's assuming, obviously, a totally different case. I'm just curious what the line is. Well, I would just refer to the record here. I mean, in her affidavit, the fear that she expresses is specifically not of physical assault, but of the ignition. She never says, I was afraid he was going to choke me. I was afraid he was going to hit me. What she says is, I was afraid that he was going to ignite the gasoline and either affect myself or affect one of the bystanders. So we're back then to, in terms of what would have been permissible then, that still relies upon the reasonableness of that, underlying determination that he had gasoline. When, as has been observed here, that determination may have been reasonable, as Mr. French suggested initially, by the color, by an observation. But in order for her ultimate decision on use of force to be reasonable, she has to consider the things she's learned during the course of this interaction. And she has observed him drinking deeply from the jug during that time. So we know. I'm concerned in that context about the training of the officer. Isn't there evidence in the record that she had had three or four trainings on mental health issues to be addressed in incidences and been trained in de-escalation as opposed to her appearing to be escalating the situation? That's, we argue that that training forms a part of the standard here. That's to be, or at least the legal criteria to be applied in determining reasonableness. Because her training requires, it does not require that she be able to identify or diagnose a particular condition, but it does require that an officer in that situation be able to identify the symptoms, to identify the situation and use different tactics. The tactics, in fact, Montgomery County's policy is part in this record. It's Defendants Exhibit 6. It makes specific use of, it provides specific guidance about how officers are to remain calm and avoid overreacting, try not to move suddenly, give rapid orders, or to shout, do not verbally abuse or threaten the person. And each of these things come into the analysis when we determine whether her use of force here was reasonable. If she could have, because going back to the Palma case, which I agree with Judge Murphy is the principal authority here, the Palma case specifically is one of its criteria, would have the court consider whether the officer could have diffused the situation with less forceful tactics. Do you think mental health doesn't necessarily cut both ways too? I agree on the one hand, a person who is under a mental health struggle has less moral culpability because in some sense it's not volitional conduct. So that's a sympathetic point. But on the other hand, the person might have less inhibition to engage in risky conduct. And so in some respects doesn't that suggest force might be more necessary? Because their inhibition is lower as compared to somebody who has mental stability? Well, what Montgomery County policy reveals is that a more measured approach is required for exactly the reasons you've identified. That a person experiencing that type of symptoms might very well be much more unpredictable and much less conscious of the social norms and the consequences. And that's precisely why in those contexts the officers are trained to use less confrontational techniques. So I agree with you that maybe that should be the policy, but doesn't that exacerbate the risk? I mean, somebody who's more erratic, it just strikes me that the risk could be seen as objectively greater. Well, on that point I defer to the training. I defer to what the standard is. But in the overall analysis of reasonableness, though, we have to go back to the Palmer criteria again would say, would start with why was this officer called to the scene? And in this case, this officer was called to the scene for a suspicious person, and the person was suspicious solely because, according to the dispatch sheet, he was running around with no shoes because he was making funny noises. Nobody had been threatened. Nobody, no crime had been committed whatsoever. So at that starting point, the level of force that that officer is entitled to use is minimally low. It's fair to ask, in this case, what would have happened if Corey Driscoll had simply walked past the officer, completely oblivious to her commands, and got in his car? Could he have stopped her at that? Could she have arrested him then? What would she have arrested him for? What would have been the justification for her using some amount of force like laying hands on him at that point? The use of force that we allege here is not simply the firing of the weapon. It's the entirety of the interaction. We assert claims for false arrest. I see that my time has passed. I'll finish this thought and conclude. But the use of force here is broader than just that, and the errors committed in the unconstitutional conduct by Deputy Smiley are encompassed by the entirety of the circumstances. Thank you. Thank you. We'll hear a rebuttal. Thank you. Mr. Lindemann stated a phrase that was repeated several times in his brief and was essentially adopted by the district court on the second step of the analysis, which is, was this right clearly established at the time of the incident? And the phrase is that Driscoll was unarmed and non-dangerous. We would submit that if you watch the video, his behavior, his erratic behavior, his yelling, his mannerisms, his sort of coming at Deputy Smiley despite the fact that she had a weapon pointed at him. I think that fits within your argument earlier, but I would like to understand what the case law that you rely on. There are a number of cases, the Martin case. There are just a number that are discussed in this that have to do with mental incapacity and police officer force. My reading of your opening brief is that you rely on Mitchell as clearly established law. I'm struggling with that because the suspect in Mitchell, what came with that report, is that he had assaulted someone, he was driving drunk, and had led police on a high-speed chase. How is that at all comparable to the circumstances in this case? Well, in part because of the aggressiveness in Mitchell and the refusal to comply with the orders, the constant approaching of the officer in an aggressive manner despite. I think what I'm struggling with here is that I don't know that anybody disputes that the deputy thought this was gasoline. The only question is whether that was reasonable in these circumstances. That depends on the information she received and the reasonableness of her conclusion about it. That's why Mitchell, to my estimation, doesn't apply. What that officer knew was that there's somebody out there that's assaulted somebody, driving drunk, and leading police officers on a wild chase. That is so distinct from the totality of the circumstances in this case that I don't understand how you think that that governs. Well, it governs in part because in Mitchell the officers knew the volatility, the threat, possible threat level of the suspect. It was absolutely reasonable for them because of that information. Yes, they knew that beforehand. Here, and I agree, it's not squarely on point, but here, Deputy Smiley, all she knew is there's a suspicious person, he might have a lighter, he may be on something. Let me ask you, my understanding of the testimony in this case is that there was an admission that the gasoline was not spoken about, I guess I would say, verbally. Can you point me in the record to where Deputy Smiley testifies that she had read the written report that was on her computer? Because you say that's the way she knew that gasoline was involved or that a lighter was involved. Can you point me where in the record that is? Where she specifically says she read the notes? Yes, because otherwise all she did was hear the very limited information provided by the direction to go to the site. As I stand here now, I cannot direct you specifically to where in the record she says she read those notes. I think a reasonable inference can be drawn that she did, and that's because in explaining why she did what she did, she believed he had doused himself in gasoline and she believed he had a lighter. If she hadn't read the notes, then there would be nothing about a lighter. So she must have read that. Unless she jumped to an unreasonable conclusion. I would disagree that she jumped to that conclusion. I think her actions were reasonable in this case, and not only was her use of force reasonable under the Fourth Amendment, but I believe that even if that were violated under the specific factors of this case, based upon how she acted and what she knew, it was not a right that was clearly established. And for both of those reasons, we would ask that you reverse. Okay. Thank you, counsel. Thank you both for your excellent advocacy today. The case is submitted, and the clerk can call the second and final case.